(No. 6377.   July 21, 1937.)

WILLIAM NORMINGTON, Respondent, v. FRANK NEELY, Doing Business Under the Firm Name and Style of MOSCOW TAXI COMPANY, Appellant, F. NEELY & SONS, and CHARLES NEELY, Defendants.

[70 Pac. (2d) 396.]

Latham D. Moore, for Appellant.

A. H. Oversmith, for Respondent.

AILSHIE, J.—In 1933 Frank Neely was engaged in doing business under the name of the Moscow Taxi Company. His sons, Malcolm and Albert, were working for him as manager and garage mechanic, respectively. Another son, Charles, defendant herein, drove a taxi for his father and helped out around the garage. Charles testified that he was ''working on a fifty percent basis; he [father] furnished the car and taxi, paid the gas and oil, and I got fifty percent of what I took in.'' His father's testimony was to the same effect: ''He [Charlie] was working for himself.'' He worked on a commission ''whenever he felt like it,'' and ''there was anything for him to do.'' Respondent was also engaged in the taxi business and had formerly been in the employ of appellant for about four years. About four stages a day were coming into Moscow at that time; on the particular day in question there were some extras.

On a Sunday evening in April, 1933, Charles Neely met the 7:20 Union Pacific Stage from Spokane ''to get fares.'' Respondent testified that he ''made the Spokane stage at eight o'clock and the ten o'clock stage from Lewiston, at night.'' Respondent's testimony shows that he got checks from two girls and ''started to look for their baggage'' just as Charlie came up and asserted they were his ''passengers.''

According to Charlie's testimony he secured two checks from the first two girls getting off the stage and asked a third girl for her check and she nodded her assent. After he turned back from the first two girls respondent had the third girl's check. Later on cross-examination defendant testified that he didn't know whether the third girl gave the check to Normington or not; that he had it all right and it looked "like he had taken it out of her hand." The question was then asked defendant:

"Q. And in your presence didn't he [Normington] ask the girls which taxi they wanted to take?

"A. Yes.

"Q. And didn't the girl reply to him 'it doesn't make any difference?'

"A. Yes."

The above conversation was also testified to by respondent. This is all that occurred between respondent and Charlie Neely at that time.

About 8 o'clock following this defendant went back to the garage where he engaged in conversation with his father and two brothers relative to the above incident. He told them he was going to "fight" Normington and they objected and told him to go home and go to bed and forget about it. At that time (8:15 P. M.) defendant checked in his money and left the garage; he didn't take the taxi with him or drive it again that day. He went to a show and later (about 10 o'clock), on coming from the show he, noticing respondent pulling in back of the stage at the station, walked up to Normington, hit him, grabbed him by the arms and shoved him over by the Francis Drug Store. Following this maneuver Charlie inflicted quite severe punishment on respondent. In his testimony Normington recounted his injuries as a result of the battery.

The case was not tried as against defendant Charlie Neely, although he was present at the trial and testified; and no verdict was returned as to him. The trial was had and the verdict was returned solely against Frank Neely, as employer doing business under the name and style of Moscow Taxi Company.

Charlie Neely worked for his father about four years. Charlie's testimony showed that he didn't meet any more stages or trains after the altercation unless he had to; that it was his intention not to. Malcolm Neely testified that his father told Charlie to stop that. Respondent and wife each testified that he did subsequently meet trains.

This action was brought against defendants to recover actual, special and punitive damages and costs and disbursements of the action. The cause was tried before the court and jury and judgment on the verdict entered, fixing compensatory damages in the sum of $576, with interest and costs. From this judgment defendant, Frank Neely, appeals.

It is contended by appellant that there was no evidence submitted ''tending to show that Charles Neely was in any manner transacting his master's business at the time of the assault and battery on respondent''; and that the evidence does not support the verdict. In order to sustain the verdict it was necessary to find, (a) that the occurrence, which took place on the arrival of the 9:50 bus, was merely a continuation of the occurrence which took place on the arrival of the 7:20 bus; and (b) that the battery was committed by Charlie Neely while engaged in the course of transacting his employer's business. The evidence stands undisputed that Charlie Neely was not working any fixed time or on a fixed salary, but rather that he was working ''whenever he felt like it''; and when he did work his compensation was fixed at fifty per cent of the fares he collected. It is likewise undisputed that immediately after the incident, which occurred on the arrival of the 7:20 stage, and about 8:15, he returned the taxicab, he had been driving, to the garage and turned in his money and ended his services for the day. At that time he discussed with his father and brothers the altercation which he had had with Normington and made the declaration that he ''was going to fight him,'' to which they objected and all of them protested against any such proposed conduct. They all thereupon told him to forget about it. ''We don't want to have any trouble''; and his father, Frank Neely, told him: ''Charlie, just forget about that, don't bother him at the train or anywhere, go home and go to bed,

and in the morning you will get up feeling better.'' He thereupon left the garage and went to a picture show and later came out just about the time of the arrival of the 9:50 stage. As he walked up the street Normington drove his taxicab up and stopped immediately back of the stage and it was there that Charlie encountered him. Immediately thereafter the battery was committed.

The only real conflict, existing in the evidence in this case, relates to the exact whereabouts of appellant Frank Neely at the time of the assault, and an alleged statement made by him. Frank Neely and the three sons all claim that Frank was up at the *front of the stage* where the passengers were getting off, soliciting fares, while Normington says he was at the *back end of the stage* where he could see what was going on and where Normington could hear what he said. Normington testifies that upon the arrival of the Neelys at the stage Frank called out, ''Go get him, Charlie!'' As far as the record shows, no one else heard this statement. The Neelys deny that such statement was made and testify that there were a number of passengers on the stage and that Frank called out to his son, Malcolm, and said: ''Run and get the taxi.'' It seems that appellant's garage was only about 150 feet from the place where the stage stopped and he had not driven a taxi over to the stage but simply went over to see if he could get any passengers, depending on getting a taxi later if he had any need for it.

It is clear from all the evidence that Charlie Neely was not on duty and was not engaged in the service of his employer after he returned the taxi to the garage and reported his receipts at 8:15 P. M. of that day. When he encountered Normington on the arrival of the 9:50 stage that evening, he was not on duty and was not engaged in the work of service of the employer. Engaging in a fist fight with another taxi driver was not in furtherance of the business of the master, nor was it fairly within the scope of his employment. It cannot be said that the employment of a man to drive a taxicab contemplates committing an assault or battery, either in the course of procuring passengers or preventing a competitor from procuring them. The blows struck by Neely were not

given in repelling a trespass or injury to the employer's property, nor were they in defense or protection of a passenger or the luggage of a passenger. "The servant was not at the time of the accident actually performing any service for his employer. Therefore, the latter was not responsible for his acts." (*Martinelli v. Stabnau,* 11 Cal. App. (2d) 38, 52 Pac. (2d) 956.)

Cooley on Torts, fourth edition, volume 3, section 396, page 78, says:

"It is not, as a general rule, within the scope of the servant's employment to commit an assault upon a third person and the master is not liable for such an assault, though committed while the servant was about his master's business." (See, also, *John v. Lococo,* 256 Ky. 607, 76 S. W. (2d) 897.)

In the latter case the court quoted the foregoing excerpt from Cooley on Torts and subsequently said:

"The master is liable for an assault of his servant on a third person, if the servant was doing what he was employed to do at the time of the injury; that is, the act of the servant was or is reasonably incident to the service the servant was employed to render. The master is only liable where his duty to a third party is violated by the servant's conduct in attempting to perform the service . . . . If the assault of a servant of a third person is done in the execution of the authority given him by the master and for the purpose of performing what he was directed to do, the master is responsible whether the wrong done was occasioned by a wanton, willful purpose, or to accomplish his business in an unlawful manner, but, if the servant commits a wrongful act without authority, and not for the purpose of executing the orders or doing the work of his master, the latter is not responsible therefor." (See, also, *Gosselin v. Yellow Cab Co.,* (Mo. App.) 29 S. W. (2d) 186.)

"It is elementary that the master is responsible for the tort of his servant which results in injury to another when the servant is acting by authority or within the scope of his employment and about the master's business. . . . . On the other hand, it is equally well established that the master is not liable if the tort of the servant which caused the injury

occurred while the servant was engaged in some private matter of his own, or outside the legitimate scope of his employment, and without specific authority from the master." (*Parrish v. Boysell Mfg. Co.*, 211 N. C. 7, 188 S. E. 817, 819.)

Even though Charles Neely was not in the employ of appellant, Frank Neely, at the time he committed the assault and battery, and for that reason the battery was not committed by the servant in the course of his service, nevertheless, if Frank Neely directed, requested or inspired the commission of the battery by Charlie Neely, then he would be liable as a joint tort-feasor rather than as an employer and master of the servant. We, therefore, conclude that the evidence in this case is not sufficient to support the verdict, holding the employer liable on the theory that the act was committed by the servant in the course of his employment. On a retrial of the case the question may be tried out as to whether or not appellant, Frank Neely, requested, directed or inspired the assault and battery, and whether or not he was guilty of such conduct as would make him liable as a joint tort-feasor.

Assignment of error has been made against the italicized portion of instruction No. 4 which reads as follows:

"Plaintiff has alleged in his complaint that such battery was within the course of the employment of the said Charles Neely by the defendant, Frank Neely, and by the words 'course of employment' is meant that the act must be something which is fairly and naturally incident to the business engaged in by the defendant, Frank Neely, and the servant, Charles Neely, must have been engaged at the time upon the master's business and the act complained of must have been done with the view of furthering the master's interest *or from some impulse or emotion which naturally grew out or was incident to an attempt to perform the master's business, and that such act did not arise wholly from some external, independent personal motive on the part of the servant to do the act complained of, of his own volition or his own will.*"

It will be noted, from the foregoing instruction, that the court, after correctly telling the jury that in order to render the master liable the servant "must have been engaged at the time upon the master's business and the act complained of

must have been done with the view of furthering the master's interest," then proceeded to tell them, "or from some impulse or emotion which naturally grew out or was incident to an attempt to perform the master's business," etc. This was erroneous and prejudicial. The fact that something occurs during the course of a servant's employment, or while he is in the discharge of his duty, which arouses his ire or displeasure, affords no reason or ground for holding the employer liable for a battery the servant may subsequently commit after the employment is completed or he goes off duty.

Objection is also made to the latter part of instruction No. 5, reading as follows:

*"In considering whether or not the said Frank Neely approved of the acts of the said Charles Neely, you may take into consideration the relative position of the said Charles Neely, Frank Neely, and William Normington at the time of the battery. You will consider whether or not the said Frank Neely in any manner interfered with the acts of his son or whether or not he assisted or did not assist in separating the parties to the conflict."*

The prejudicial portion of the foregoing instruction is to be found in the last sentence which at least implies that the court considered it the duty of Frank Neely to interfere with and restrain Charlie from entering into the fight or committing the battery, and is at least open to the implication that this duty was due because of Charles Neely being the son of Frank Neely. Charles Neely was a man 29 years old, and the father was under no more legal responsibility to restrain him from committing a battery than he was to restrain any stranger from so doing; and he was certainly not liable, as a joint tort-feasor, for any battery he might commit, unless he advised, aided, abetted or encouraged the assault or had previously counselled the violence.

Judgment is reversed and a new trial is granted. Costs awarded in favor of appellant.

Morgan, C. J., and Budge, J., concur.

Givens, J., dissents.